

12-2751SAG

Affidavit in Support of Application for Search Warrant

7003 Elm Avenue, Elkridge, Maryland 21075

Christopher S. Thrash, being duly sworn, states that he is a Senior Special Agent with the United States Department of Homeland Security (DHS), Office of the Chief Security Officer (OCSO), duly appointed according to law and acting in good faith.

Upon information and belief, evidence, fruits, instrumentalities or proceeds related to the violation of 18 USC §793, Gathering, Transmitting or Losing National Security Information, and 18 USC §1001, False Statements, are located at 7003 Elm Avenue, Elkridge, Maryland 21075.

The source of your affiant's information and the grounds for his belief are as follows:

1. I have been a Special Agent of the DHS OCSO for six years. During that time I have investigated the compromise of government classified information. I have been trained in the detection and investigation of sensitive security violations and counterintelligence activities. My training and experience enables me to determine the willful compromise of government classified information.

2. I am familiar with the facts and circumstances set forth below from my participation in the investigation and conversations with other law enforcement officers involved in the investigation. The information provided in this affidavit is provided for the limited purpose of establishing probable cause in connection with this application. This is not a complete statement of all the facts and circumstances related to this case. However, I have not omitted any fact which would tend to negate a finding of probable cause.



12-2751SAG

3. On June 23, 2011, the DHS OneNet Security Operations Center (SOC) observed suspicious activity that appeared to involve classified material (SECRET) traversing the DHS unclassified computer network.

4. On July 1, 2011, the DHS SOC discovered through further investigation that there was in fact a document classified at the SECRET level related to a sensitive National Security Agency (NSA) program on the DHS unclassified network that had been downloaded from an unidentified personal YAHOO e-mail account. Cyber analysis was suggestive that the vector (meaning source) of this network transmission was associated with Brent SMITH, Senior Budget Analyst, DHS Domestic Nuclear Detection Office (DNDO). The SOC reported that there was evidence of a Yahoo session being open on SMITH's computer at the same time the SECRET document was transmitted. There was no definitive link between SMITH's Yahoo session and his DHS computer, and there was no capture of any e-mail headers that would definitively indicate who sent the message and who the recipients were other than SMITH. The DHS SOC was unable to definitively identify the original source data of the e-mail in question or the intended recipient because of the configuration of the DHS IT security infrastructure. The DHS SOC was able to acquire a copy of the classified document through log analysis.

5. On July 5, 2011, SOC Thomas TULLIA, Information Systems Security Officer (ISSM), DHS DNDO, and Noel SILLS, Special Security Officer (SSO) DNDO, interviewed SMITH. SILLS stated that SMITH denied knowing anything about an e-mail that was sent to him on his personal Yahoo account that contained a classified document. SMITH claimed that he had no idea how or why he would have received a classified document on his DHS unclassified computer.





6. On August 19, 2011, your affiant interviewed SMITH. SMITH explained that he worked for the US Air Force for 13 years, NSA for 12 years, Office of National Counterintelligence Executive (ONCIX)for 3 years, and the Federal Bureau of Investigation (FBI) for 1 year. He stated the he was released from the FBI at the end of his probationary period. Your affiant showed SMITH a hard copy of the classified NSA document in question that was discovered by the DHS SOC during the time of the original network incident on June 23, 2011. SMITH stated that he did in fact recognize it, and that he had worked on that specific project while working at the NSA. SMITH stated that he had no idea how or why someone would have sent that document to one of his personal Yahoo e-mail accounts. SMITH explained that he has two Yahoo accounts: basmit3_2004@yahoo.com and bsmith9_new@yahoo.com. SMITH stated that he has had a security clearance since 1994.

7. On October 26, 2011, your affiant confirmed with the NSA Office of Security that the document in question was and still is classified SECRET. Your affiant also confirmed with the NSA Office of Security that SMITH did work on that program at the time the document was created.

8. On February 21, 2012, pursuant to lawful authority, DHS OCSO Cyber Forensics Branch acquired an image of SMITH's DHS computer in order to monitor his cyber activity to observe if there were any other indicators of suspicious activity.

9. On March 15, 2012, DHS OCSO Cyber Forensics Branch completed the analysis on a current image of SMITH's DHS computer which was acquired on February 21, 2012. No evidence of classified material was discovered on the current image of SMITH's DHS computer.



12-2751SAG

10. On May 23, 2012, your affiant again interviewed SMITH. Your affiant explained to SMITH that the interview was completely voluntary, that he was not in custody and that he could stop the interview at any time. SMITH stated that he understood. Your affiant also provided SMITH with a Garrity Warning.[1] SMITH read and signed the warning, and he stated that he understood the document. SMITH confirmed that he is still employed as a Senior Budget Analyst for DNDO. SMITH stated that he currently has a SECRET clearance with DHS. SMITH initially stated during the interview that he had no idea how a NSA classified document that he had worked on several years ago was sent to a Yahoo e-mail account that appeared to be linked to his DHS computer while his user account was logged into that specific DHS system. Your affiant showed SMITH a copy of the classified document and asked him if he had worked on it. SMITH stated that he did remember working on that document and that specific program at NSA. Your affiant then showed SMITH a copy of the network logs that were captured during the initial cyber incident, and explained to him how his DHS computer was associated with the network traffic that included the classified document. After reading the network logs, SMITH changed his position and stated that if he did send the document to himself, he does not remember doing it. He then stated that it was quite possible that he did send that specific document to himself from his personal Yahoo e-mail account. SMITH stated that he remembers thinking that the NSA project was "neat", and that he may have taken the

[1] The form contained the following information: "This interview is voluntary. You have the right to remain silent if your answers may incriminate you. Anything you say may be used against you as evidence both in an administrative proceeding or any future criminal proceeding. Although you would normally be expected to answer questions regarding your official duties, in this instance you are not required to do so. Your refusal to answer on the grounds that your answers may tend to incriminate you, will not subject you to disciplinary action by the Office of the Chief Security Officer/or the Department of Homeland Security. I have read the aforementioned and agree to the terms mentioned herein."

A E.E. 6/8/12



document home for that reason. He went on to explain that he has taken classified material home in the past, and that he would immediately return it back to work without reporting these incidents to security. SMITH also stated that he would regularly convert government documents to .pdf format so that he could use them at other government jobs. SMITH explained that it is possible that he took the document in question home, and that it is possible that he did scan it and convert it to a .pdf, and that it is possible that he did e-mail it to himself from his personal Yahoo e-mail account. He stated that he simply does not remember doing it. SMITH stated that there is an 80% chance that he did send the document to himself from his personal Yahoo e-mail account. It is reasonable to believe that SMITH e-mailed the government documents to himself from home because of his original assertion that he would regularly take government documents home and scan them on his home scanner and e-mail them to himself on his personal Yahoo e-mail account. SMITH also provided a written sworn statement recounting the incident.

11. Your affiant has verified that SMITH lives at 7003 Elm Avenue, Elkridge, Maryland 21075 by confirming with the Maryland Motor Vehicle Administration that his drives license is valid and that his listed address is 7003 Elm Avenue, Elkridge, Maryland 21075. Additionally, your affiant verified SMITH's address through his DHS personnel records. Your affiant also verbally confirmed with SMITH that he currently resides at 7003 Elm Avenue, Elkridge, Maryland 21075. Your affiant recently drove by 7003 Elm Avenue, Elkridge, Maryland 21075 and observed a vehicle with the license plate number 6AG G99 parked in the drive way which according to Maryland Motor Vehicle is registered to SMITH.

12-2751SAG

A.E.E. 6/8/12

12. Based upon my experience, training, and the information above, I know that persons involved in the misuse of government computers and classified information will do so from both their work and home computers and will keep other records of their activities. I am also aware that this type of information as set forth in Attachment B is commonly stored at their place of employment and their place of residence and can be in the form of paper documents or electronic files, either on a computer or on electronic storage media and devices.

13. Based on your affiant's knowledge, training, and experience, your affiant knows that computer files or remnants of such files can be recovered months or even years after they have been downloaded onto a hard drive, deleted or viewed via the Internet. Electronic files downloaded to a hard drive can be stored for years at little or no cost. Even when such files have been deleted, they can be recovered months or years later using readily-available forensics tools. When a person "deletes" a file on a computer, the data contained in the file does not actually disappear; rather, that data remains on the hard drive until it is overwritten by new data. Therefore, deleted files, or remnants of deleted files, may reside in free space or slack space - that is, in space on the hard drive that is not allocated to an active file or that is unused after a file has been allocated to a set block of storage space - for long periods of time before they are overwritten. In addition, a computer's operating system may also keep a record of deleted data in a "swap" or "recovery" file. Similarly, files that have been viewed via the Internet are automatically downloaded into a temporary Internet directory or "cache." The browser typically maintains a fixed amount of hard drive space devoted to these files, and the files are only overwritten as they are replaced with more

A.S.S. 6/8/12

12-2751SAG

recently viewed Internet pages. Thus, the ability to retrieve residue of an electronic file from a hard drive depends less on when the file was downloaded or viewed than on a particular user's operating system, storage capacity, and computer habits.

14. Based upon your affiant's knowledge, training and experience, your affiant knows that searching and seizing information from computers often requires agents to seize most or all electronic storage devices (along with related peripherals) to be searched later by a qualified computer expert in a laboratory or other controlled environment. This is true because of the following:

A. The volume of evidence: Computer storage devices (like hard disks, diskettes, tapes, laser disks) can store the equivalent of millions of pieces of information. Additionally, a suspect may try to conceal criminal evidence; he or she might store it in random order with deceptive file names. This may require searching authorities to examine all the stored data to determine which particular files are evidence or instrumentalities of crime. This sorting process can take weeks or months, depending on the volume of data stored, and it would be impractical and invasive to attempt this kind of data search on-site.

B. Technical Requirements: Searching computer systems for criminal evidence is highly technical process requiring expert skill and a properly controlled environment. The vast array of computer hardware and software available requires even computer experts to specialize in some systems and applications, so it is difficult to know before a search which

A.E.S. 6/8/12

12-2751SAG

expert is qualified to analyze the system and its data. In any event, however, data search protocols are exacting scientific procedures designed to protect the integrity of the evidence and to recover even "hidden," erased, compressed, password-protected, or encrypted files. Because computer evidence is vulnerable to inadvertent or intentional modification or destruction (either from external sources or from destructive code imbedded in the system as a "booby trap"), a controlled environment may be necessary to complete an accurate analysis. Further, such searches often require the seizure of most or all of a computer system's input/output peripheral devices, related software, documentation, and data security devices (including passwords) so that a qualified computer expert can accurately retrieve the system's data in a laboratory or other controlled environment.

15. In light of these concerns, your affiant hereby requests the Court's permission to seize the computer hardware (and associated peripherals) that are believed to contain some or all of the evidence described in the warrant, and to conduct an off-site search of the hardware for the evidence described, if, upon arriving at the scene, the agents executing the search conclude that it would be impractical to search the computer hardware on-site for this evidence.

16. Searching the computer system for the evidence described in Attachment B may require a range of data analysis techniques. In some cases, it is possible for agents to conduct carefully targeted searches that can locate evidence without requiring a time-consuming manual search through unrelated materials that may be commingled with criminal evidence. For example, agents may be able to execute a "keyword" search that searches through the files stored in a computer for special words that are likely to appear only in



12-2751SAG

the materials covered by a warrant. Similarly, agents may be able to locate the materials covered in the warrant by looking for particular directory or file names. In other cases, however, such techniques may not yield the evidence described in the warrant. Criminals can mislabel or hide files and directories; encode communications to avoid using key words; attempt to delete files to evade detection; or take other steps designed to frustrate law enforcement searches for information. These steps may require agents to conduct more extensive searches, such as scanning areas of the disk not allocated to listed files, or opening every file and scanning its contents briefly to determine whether it falls within the scope of the warrant. In light of these difficulties, your affiant requests permission to use whatever data analysis techniques appear necessary to locate and retrieve the evidence described in Attachment B, subject to the requirements of Attachment C.

17. Your affiant knows that computer hardware, software, and electronic files may be important to a criminal investigation in two distinct and important ways: (a) the objects themselves may be evidence, fruits, and property intended for use or used in committing crime, and (b) the objects may have been used as storage devices that evidence and fruits of crime. Rule 41 of the Federal Rules of Criminal Procedure permits the Government to search and seize computer hardware, software, and electronic files that are evidence of crime, fruits of crime, or property intended for use or used in committing crime.

18. This search will include any and all digital media including, but not limited to e-mails, hard drive back-ups, thumb drives, and other items (further described on Attachment

SAG
6/18/12

12-2751SAG

B) attached hereto and incorporated by reference. These constitute evidence of the crimes specified in this affidavit. This affidavit also requests permission to seize computer hardware if it becomes necessary for reasons of practicality to remove the hardware and conduct a search offsite.

19. For the foregoing reasons, there is probable cause to believe that the residence of Brent SMITH, located at 7003 Elm Avenue, Elkridge, Maryland 21075 contains evidence, instrumentalities, and fruits of crimes, including violations of 18 USC §793, Gathering, Transmitting or Losing National Security Information, and 18 USC §1001, False Statements.

20. I respectfully request that a search warrant be issued pursuant to Rule 41 of the Federal Rules of Criminal Procedure to search the residence of Brent SMITH, located at 7003 Elm Avenue, Elkridge, Maryland 21075, and to open any closed containers or other closed items found therein (including any locked containers, encrypted computer files, or other computer files found there) and to seize said items set forth in Attachments B and C.

Christopher S. Thrash
Senior Special Agent, DHS Office of Security
Department of Homeland Security
Washington, DC

Signed and sworn before me this 8th day of June, 2012

Stephanie A. Gallagher
U.S. Magistrate Judge